

**Signed and Filed: April 6, 2026**

_____

**HANNAH L. BLUMENSTIEL**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>MARY HANNAH MURRAY and DAVID ANTHONY MURRAY,<br><br>　　　　　　Debtors. | ) Case No. 24-30153 HLB<br>)<br>) Chapter 7<br>)<br>)<br>)<br>) |
| AJANG AJEE SALKHI,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>MARY HANNAH MURRAY and DAVID ANTHONY MURRAY,<br><br>　　　　　　Defendants. | ) Adv. Proc. 24-03025 HLB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM DECISION AFTER TRIAL

This proceeding came before the court on February 24, 2026 for trial. Mr. John Warner appeared for Plaintiff Ajang Ajee Salkhi; Mr. Wayne Silver appeared for Defendants/Debtors Mary Hannah Murray and David Anthony Murray. The court heard testimony from Mr. Salkhi, Ms. Murray, Mr. Murray, Mr. Thomas Levine, and Ms. Maureen Kelsey.

After Mr. Salkhi closed his case-in-chief, the court issued an oral ruling pursuant to Civil Rule 52(c)[1] and Bankruptcy Rule

---

[1] Unless otherwise indicated, all statutory citations shall refer to Title 11 of the United States Code (the "Bankruptcy Code"). All citations to a

7052, finding and concluding that Mr. Salkhi had failed to prove by a preponderance of the evidence that the alleged debt owed by the Murrays to Mr. Salkhi is nondischargeable under § 523(a)(2)(A). After reading its oral ruling into the record, the court promised to issue this memorandum decision and order.

### I.   Jurisdiction

This proceeding involves a cause of action arising under § 523(a)(2)(A).[2]  Accordingly, this action constitutes one in which this court may issue final orders and judgment.[3]

### II.  Findings of Fact

Mr. Salkhi and his wife, Ms. Tannaz Salkhi, own a home located at 70 Rock Road, Kentfield CA (the "Property").  The Salkhis have two children who attend a private elementary school in Marin County.  The Murrays have children who attend school with the Salkhis' children.

According to Mr. Salkhi, his family and the Murrays developed a "school friendship."  Ms. Salkhi and Ms. Murray became close friends, frequently speaking over the phone and attending events together with their children.  Ms. Murray testified at trial that by 2022, she considered Ms. Salkhi to be

---

"Bankruptcy Rule" shall refer to one of the Federal Rules of Bankruptcy Procedure and all citations to a "Civil Rule" shall refer to one of the Federal Rules of Civil Procedure.

[2] Mr. Salkhi orally withdrew his cause of action under § 523(a)(4) at the February 24 trial.

[3] 28 U.S.C. § 1334(b); 28 U.S.C. §§ 157(a), (b)(1), and (b)(2)(I); General Order No. 24 of the United States District Court for the Northern District of California; see also In re Mcharo, 2020 WL 118589, *2 (B.A.P. 9th Cir. Jan. 9, 2020) (acknowledging bankruptcy court's subject matter jurisdiction over proceedings asserting claims under § 523).

her best friend.  Mr. Salkhi, on the other hand, considered Mr. Murray to be an acquaintance and testified that Ms. Murray and Ms. Salkhi were the "real friends."

Mr. Murray was a Class B general contractor licensed by the California Contractor's State Licensing Board (the "CSLB").  Mr. Murray obtained his Class B license in 2011 (the "License") and has performed nearly 100 construction projects in his career, including several residential home remodeling projects.  A Class B contractor's license must be renewed every four years, and Mr. Murray routinely renewed his License whenever it expired.

Mr. Murray owned and operated a sole proprietorship construction business:  MB Construction.  Mr. Murray testified that MB Construction once employed over 300 employees across three offices, but the COVID-19 pandemic caused his business to shrink significantly.

Ms. Murray is a purchasing manager at Prima Fleur Botanicals, where she has worked for over 15 years.  Ms. Murray also assisted with Mr. Murray's business by managing MB Construction's sole bank account held at West America Bank (the "Business Account").  According to Ms. Murray, when Mr. Murray asked her to make payments from the Business Account, she would write checks or withdraw cash in accordance with his instructions.  Aside from that, Ms. Murray had no involvement in MB Construction.

In 2022, the Salkhis decided to undertake a major remodeling project at the Property.  This project involved reconfiguring the Property's ground floor, shifting the TV placement, and replacing and updating a sliding door and flooring (the "Project").  In

late 2022, Mr. Salkhi began discussing the Project with several contractors.

On October 31, 2022, the Salkhis and Murrays attended a Halloween party at a mutual friend's house. At this point, the Salkhis had a general idea of the Project's scope, but they had not decided on many details. Mr. Salkhi discussed the Project with Mr. Murray during the Halloween party, and Mr. Murray agreed to offer an informal opinion and review the Project as a friendly gesture. Mr. Murray's License was active at that time.

After the Halloween party, Mr. Murray and Mr. Salkhi discussed the Project over the phone. Mr. Murray then visited the Property with Mr. Salkhi.

In December 2022, Mr. Murray understood that his License was active. But he was also aware that North River Insurance Company cancelled his contractor's bond effective December 23, 2022, and he understood that he needed to maintain a contractor's bond to retain his active License.

Around the same time, Mr. Salkhi and Mr. Murray began discussing a formal agreement for Mr. Murray to undertake the Project. Ms. Murray warned both Ms. Salkhi and Mr. Murray that it was not a good idea to work with friends. But on December 17, 2022, Mr. Murray emailed Mr. Salkhi an initial estimate for the Project. Mr. Murray's December 17 email indicated that, if Mr. Salkhi agreed to the estimate, Mr. Murray would put the estimate "into a small contract for [them] to sign."

Mr. Salkhi orally indicated to Mr. Murray that this initial estimate was too expensive. After Mr. Salkhi insisted, they also agreed to proceed without a written contract. Mr. Murray then

prepared a revised estimate dated December 15, 2022.  Mr. Murray physically handed this estimate to Mr. Salkhi, who approved it orally in late December 2022.  Mr. Murray's emails and estimates did not provide Mr. Murray's License number and did not address or represent in any way whether Mr. Murray held an active License, maintained worker's compensation insurance, or maintained a contractor's bond.

On December 20, 2022, Mr. Salkhi emailed Mr. Murray, stating that he was "looking forward" to getting started on the Project and confirming the initial scope of work.  The parties never signed a written contract despite that being Mr. Murray's standard practice.  Neither Mr. Salkhi nor Mr. Murray obtained permits for the Project.

The CSLB suspended Mr. Murray's License on December 23, 2022 for failure to maintain his contractor's bond.  According to Mr. Murray, when the CSLB suspends a license, it is supposed to send a notice of suspension to the contractor by first class mail. But Mr. Murray testified that the CSLB was "notorious" for not sending this and other types of notices and asserted that he had not received prior notices from the CSLB, even when online records indicated they had been sent.  Mr. Murray credibly testified that he did not receive notice of his December 23, 2022 License suspension and was not aware at any point in 2022 that his License was suspended.

Mr. Salkhi and Mr. Murray agreed that Mr. Murray would pay for labor, while Mr. Salkhi would pay for material costs.  Mr. Salkhi made his first payment to "MDM Contracting" on January 4, 2023 in the form of a $25,000.00 check.  He made two additional

$2,500.00 payments to Mr. Murray that same day for a total of $30,000 in advance payments. Mr. Murray was aware that, under the CSLB regulations, it was illegal to demand a downpayment greater than $1,000.00.

Mr. Murray and his crew began physical work on the Project in early February 2023, and Mr. Salkhi paid Mr. Murray a total of $40,000.00 for his work during the month of February. Mr. Murray hired Mr. Chuck Voong to prepare certain preliminary drawings and framing diagrams. He also hired his foreman, Mr. Alfredo Patricio, to perform much of the manual labor, including plumbing and electrical work. Mr. Patricio is not a licensed general contractor, but Mr. Murray testified that under the CSLB regulations, Mr. Patricio was authorized to perform this work under the supervision of a Class B licensed general contractor.

Mr. Salkhi soon began requesting changes to the Project's scope and price. The parties discussed methods of keeping costs down, including changing the agreement from a standard bid agreement to a time and materials ("T&M") agreement. According to Mr. Murray, a standard bid agreement specifies the work to be done and provides a corresponding price for that work. A T&M agreement, however, provides a flat payment for a set period of time regardless of what work is actually completed, plus the cost of materials.

On March 8, 2023, the CSLB again suspended[4] Mr. Murray's License after he failed to satisfy an outstanding liability to the California Employment Development Department (the "EDD").

---

[4] The CSLB issued this additional suspension despite already suspending Mr. Murray's License in late December 2022.

Mr. Murray credibly testified that he did not receive any notice of this suspension and was not aware that his License was suspended at this time, or at any point after undertaking the Project.

On or about March 15, 2023, Mr. Murray prepared an updated estimate, which accounted for Mr. Salkhi's expanded scope of work. Mr. Murray prepared the March 15 estimate for internal purposes and never sent it to Mr. Salkhi. But Mr. Murray discussed the March 15 estimate with Mr. Salkhi, which triggered further discussions about ways to reduce the Project's cost. Mr. Salkhi ultimately decided that a T&M agreement would be cheaper, and the parties agreed to conduct the Project as a T&M, with Mr. Salkhi paying Mr. Murray a flat fee every two weeks. The parties never memorialized this modification and continued to proceed without a written contract. Mr. Murray did not know whether a T&M contract was legal under CSLB regulations.

On March 22, 2023, Mr. Salkhi emailed Mr. Murray and Ms. Maureen Kelsey that he wanted to further expand the Project's scope. Mr. Salkhi retained Ms. Kelsey in late 2022 as his interior designer for the Project, and she worked alongside Mr. Murray during her frequent visits to the Property. The parties treated this March 22 email as a formal change order, and Mr. Murray expanded the scope of work for the Project to include Mr. Salkhi's additional requests. Change orders are usually written and signed by both parties, but neither Mr. Salkhi nor Mr. Murray signed a formal agreement memorializing the March 22 email.

Mr. Murray continued working on the Project for several months. The Salkhis lived in the Property throughout Mr.

Murray's work on the Project, and Mr. Salkhi walked through and observed the Property every day. At this point, Mr. Salkhi did not notice anything wrong with Mr. Murray's work, but Mr. Salkhi became unsatisfied with the Project's progress. Mr. Salkhi's primary complaint to Mr. Murray during this time was that Mr. Murray's workers were not showing up to the job site. Mr. Salkhi also observed that Mr. Murray's crew, particularly Mr. Patricio, performed most of the physical work on the Project.

On May 8, 2023, Mr. Murray emailed Mr. Salkhi an estimate of the time he believed was necessary to complete the remaining work on the Project. This estimate did not include a price because the parties were operating under a T&M agreement, so the only relevant figure was the remaining time to finish the Project. Mr. Salkhi did not respond to the May 8 email in writing but told Mr. Murray in person to "get it done".

Around this time, Mr. Salkhi informed Mr. Murray that he wanted to return to a standard bid agreement. Mr. Murray refused, and they continued under the T&M format.

On July 7, 2023, Mr. Murray texted Mr. Salkhi a series of photographs showing his work on the Project. Mr. Salkhi responded that the work "looks great."

One of the Project's main features was the installation of a large, 22-foot-long exterior motorized door (the "Panda Door"). The Panda Door's production company prepared the initial drawings outlining the door's dimensions, and Mr. Murray approved the company's figures and measurements.

The Panda Door arrived at the Property on July 28, 2023 in two crates totaling over 1,000 pounds. Mr. Murray attempted to

Case: 24-03025   Doc# 161   Filed: 04/06/26   Entered: 04/06/26 16:05:23   Page 8 of 18

move the crates with a forklift rented by Mr. Salkhi. But when Mr. Salkhi observed Mr. Murray's attempt, he was "shocked" by Mr. Murray's handling of the crates and forklift, which led him to begin doubting Mr. Murray's qualifications and ability to complete the Project. Mr. Murray and Mr. Salkhi's relationship rapidly deteriorated following additional conversations on July 28, and Mr. Murray ceased working on the Project altogether on July 29, 2023. Mr. Salkhi paid Mr. Murray a total of $263,000.00 for his work on the Project.

On July 30, 2023, Mr. Salkhi contacted Mr. Patricio to finish construction on the Project. Mr. Salkhi knew Mr. Patricio was not a licensed general contractor, but he nevertheless employed Mr. Patricio and his co-worker to finish the Project. Mr. Salkhi calculates that he paid Mr. Patricio and his co-worker a total of $75.00 per hour for the remaining 60 days of work to complete the Project, for a total of $36,000.00 in labor.

On July 31, 2023, Mr. Salkhi discovered the CSLB website and learned that Mr. Murray's License had been suspended since late December 2022.

At trial, Mr. Salkhi's expert witness, Mr. Thomas Levine, testified that after reviewing CSLB records, he concluded that Mr. Murray's License was suspended on December 23, 2022 and remained suspended for the entire time Mr. Murray worked on the Project. Mr. Levine is a Class B licensed general contractor, and he is familiar with the CSLB's rules and regulations.

Mr. Salkhi also called Ms. Kelsey to testify as to Mr. Murray's work on the Project. Ms. Kelsey testified that there were several deficiencies in Mr. Murray's work, including damaged

outdoor pavers, improperly installed tiles, non-functioning radiating heating, and an improperly sized support beam for the Panda Door.  Ms. Kelsey is not a licensed general contractor, and she testified that her expertise is interior design, not construction.

### III. Analysis

### A.    Civil Rule 52(c)

Civil Rule 52(c), which applies in this proceeding pursuant to Bankruptcy Rule 7052, states that if a "party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  "In deciding whether to enter judgment on partial findings under Rule 52(c), the . . . court is not required to draw any inferences in favor of the non-moving party; rather, the . . . court may make findings in accordance with its own view of the evidence."[5]  "The failure of a party to establish an essential issue justifies the immediate termination of the case or claim.  Judgment on partial findings conserves time and resources . . . ."[6]

"In considering whether to grant judgment under Rule 52(c), the . . . court applies the same standard of proof and weighs the

---

[5] Unicom Int'l, Inc. v. Fed. Ins. Co., No. 2:25-CV-00664-RGK-SK, 2025 WL 3691889, at *1 (C.D. Cal. Dec. 11, 2025) (citation omitted).

[6] United States v. Freitas, No. 18CV1259-GPC(JLB), 2020 WL 13539104, at *1 (S.D. Cal. Mar. 4, 2020) (citation omitted).

evidence as it would at the conclusion of trial."[7]  The rule "authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence."[8]

**B.   § 523(a)(2)(A)**

§ 523(a)(2) "excepts from discharge debts arising from various forms of fraud.  Subparagraph (A) bars discharge of debts arising from 'false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition'."[9]  "The Ninth Circuit has consistently held that a creditor must demonstrate five elements to prevail on any claim arising under § 523(a)(2)(A)."[10]

These elements include:

**(a)** A misrepresentation, fraudulent omission or deceptive conduct by the debtor;

**(b)** The debtor must know of the falsity or deceptiveness of their statement or conduct;

**(c)** The debtor must intend to deceive the creditor;

**(d)** Justifiable reliance by the creditor on the debtor's statement or conduct; **and**

**(e)** Damage to the creditor proximately caused by their reliance on the debtor's statement or conduct.[11]  The creditor

---

[7] Unicom Int'l, Inc. v. Fed. Ins. Co., 2025 WL 3691889, at *2 (citation omitted).

[8] Id.

[9] Lamar Archer & Cofrin LLP v. Appling, 584 U.S. 709, 715 (2018).

[10] In re Slyman, 234 F.3d 1081, 1085 (9th Cir. 2000).

[11] In re Eashai, 87 F.3d 1082, 1086 (9th Cir. 1996).

must prove the existence of all of these elements by a preponderance of the evidence.[12]  Exceptions to discharge must be narrowly construed in favor of the debtor/defendant.[13]

**C.   Plaintiff failed to satisfy his burden under § 523(a)(2)(A)**

Mr. Salkhi alleges that Mr. Murray lied about having a valid contractor's License, failed to disclose the suspension of his License, and lied about his qualifications to undertake the Project.  Mr. Salkhi also alleges that Mr. Murray's fraud can be imputed to Ms. Murray because she is Mr. Murray's business partner, which renders her liable for Mr. Murray's allegedly nondischargeable debt.

**(i)   Findings as to Ms. Murray**

The court finds and concludes that Mr. Salkhi introduced no evidence proving that Ms. Murray was involved in MB Construction to a degree that would justify imputing to Ms. Murray liability for allegedly wrongful conduct by Mr. Murray.  Ms. Murray testified that she managed the Business Account in accordance with Mr. Murray's instructions.  But Mr. Salkhi introduced no evidence that Ms. Murray was involved in any other aspect of Mr. Murray's contracting business.  Ms. Murray credibly testified that she has worked full-time for a business entirely unrelated to Mr. Murray's for nearly 16 years, including the 2022-2023 period of the Project, and was not involved in the day-to-day operations of Mr. Murray's business.

---

[12] <u>Grogan v. Garner</u>, 498 U.S. 279, 290 (1991).

[13] <u>In re Higashi</u>, 553 B.R. 153, 158 (Bankr. D. Haw. 2016).

Case: 24-03025   Doc# 161   Filed: 04/06/26   Entered: 04/06/26 16:05:23   Page 12 of 18

Mr. Salkhi's pre-trial brief argues that Ms. Murray is liable under the Supreme Court's holding in <u>Bartenwerfer v. Buckley</u>, but the facts of that case are notably different.[14]  In <u>Bartenwerfer</u>, the debtors took title to real property for the purpose of renovating it and selling it for a profit.  Mr. Bartenwerfer performed the majority of the work on the renovation project, while Ms. Bartenwerfer was largely uninvolved.

The Bartenwerfers eventually sold the property to a third party, and they attested to the buyer that they had disclosed all material facts relating to the property.  When the buyer later discovered several defects with the property, they sued the Bartenwerfers, who were found liable in state court and later filed their Chapter 7 bankruptcy case in this court.

The buyer then filed an adversary proceeding under § 523(a)(2)(A).  After a two-day bench trial, this court found the Bartenwerfers' debt nondischargeable, imputing Mr. Bartenwerfer's fraudulent intent to Ms. Bartenwerfer because the two had formed a partnership to renovate and sell the property for profit.  The Supreme Court eventually agreed.

The evidence establishes that the Murrays did not jointly form MB Construction; Mr. Murray is a sole proprietor.  Ms. Murray has worked full-time elsewhere for more than 15 years and remains employed there to this day.  Ms. Murray merely provided minimal clerical assistance when needed.  Accordingly, pursuant to Civil Rule 52(c), the court finds and concludes that Mr. Salkhi has failed to prove by a preponderance of the evidence

---

[14] 598 U.S. 69 (2023).

that Ms. Murray should be liable for Mr. Murray's alleged fraud pursuant to § 523(a)(2)(A).

**(ii) Findings as to Mr. Murray**

The court finds and concludes that Mr. Salkhi has failed to prove by a preponderance of the evidence that Mr. Murray engaged in fraud, fraudulent misrepresentations, or fraudulent omissions for purposes of § 523(a)(2)(A).

**(a) Fraud, fraudulent misrepresentations, or fraudulent omissions**

First, Mr. Salkhi has failed to prove by a preponderance of the evidence that Mr. Murray falsely represented that he had a valid License when he worked on the Project. The evidence introduced at trial established that Mr. Murray did not learn of his License suspension until August 2023, well after he ceased working on the Project.

Despite the fact that the CSLB's records indicate that it issued notices of suspension of the License in 2022 and 2023, the court received no evidence whatsoever proving that these notices were, in fact, mailed to Mr. Murray. Mr. Murray credibly testified that he did not receive any such notices, and Mr. Salkhi did not introduce evidence sufficient to cast doubt on Mr. Murray's testimony.

Mr. Murray admitted that, in late 2022, he was aware of his outstanding liability to the EDD and understood that such liability could result in suspension of his License. But he also credibly testified that he was negotiating with the EDD regarding a payment arrangement that would address this outstanding liability. Based on his ongoing negotiations with the EDD, Mr.

Murray believed his License would not be suspended, and the court finds Mr. Murray's belief to be reasonable under the circumstances.

Additionally, the court received no credible evidence establishing that Mr. Murray ever falsely represented that he had a valid contractor's License, worker's compensation insurance, or contractor's bond to Mr. Salkhi. Mr. Salkhi simply never asked Mr. Murray for any of this information.

The court also finds and concludes that Mr. Salkhi has failed to prove by a preponderance of the evidence that Mr. Murray fraudulently represented his qualifications as a general contractor. Mr. Salkhi testified that Mr. Murray bragged about his experience to solicit work on the Project, yet Mr. Salkhi has produced no evidence indicating what Mr. Murray specifically said that would have induced Mr. Salkhi to award him the job. The court is in no position to assess whether Mr. Murray's alleged representations were fraudulent because Mr. Salkhi has not provided it with evidence proving what Mr. Murray actually said or why what he said was false.

Mr. Salkhi appears to want the court to infer that Mr. Murray was not qualified to work on the Project due to his allegedly poor-quality work. But Mr. Salkhi failed to prove that the quality of Mr. Murray's work was, in fact, poor. Mr. Salkhi only proved that the Project remained unfinished when he and Mr. Murray parted company.

The court finds that Ms. Kelsey's testimony was not helpful or probative as to whether the quality of Mr. Murray's work was poor. Ms. Kelsey is not a licensed general contractor, and Mr.

Salkhi did not establish a foundation for Ms. Kelsey's experience or expertise that would allow the court to rely on her assessment of Mr. Murray's work.

The evidence proves that Mr. Salkhi was satisfied with Mr. Murray's work, as demonstrated by Mr. Salkhi's July 7, 2023 text message, in which he complimented Mr. Murray's work. Mr. Salkhi also conceded that he noticed no obvious defects in Mr. Murray's work during his daily inspections of the Project.

Mr. Salkhi admitted that he hired Mr. Patricio to finish the Project after Mr. Murray quit. Mr. Salkhi knew that Mr. Patricio did the majority of the work on the Project during Mr. Murray's tenure, so this strongly refutes Mr. Salkhi's assertion that the work was poor quality. If the work was subpar, it simply makes no sense for Mr. Salkhi to hire the same person who did the majority of the allegedly poor-quality work.

**(b)   Causation**

Without a finding of fraud, there can be no finding of damages from fraud. But even if another court concludes that Mr. and Ms. Murray did engage in fraudulent activity for purposes of § 523(a)(2)(A), the court finds and concludes that Mr. Salkhi has failed to prove that he suffered any damages as a result of this alleged fraud.

Mr. Salkhi did not prove that Mr. Murray's work was of poor quality, only that it was unfinished. Mr. Murray has presented evidence that Mr. Salkhi complimented his work, and while Mr. Salkhi was at times unsatisfied with the pace of the Project, he has presented no credible evidence that Mr. Murray's work was of poor quality.

Case: 24-03025   Doc# 161   Filed: 04/06/26   Entered: 04/06/26 16:05:23   Page 16 of 18

The question of whether Mr. Murray was a licensed contractor does not determine whether his work was of poor quality. A suspended contractor's license does not equate to a lack of technical competence. Mr. Salkhi failed to prove how Mr. Murray's alleged fraud caused him harm. Accordingly, pursuant to Civil Rule 52(c), the court finds and concludes that Mr. Salkhi has failed to prove the elements of § 523(a)(2)(A) by a preponderance of the evidence.

**IV. Conclusion**

For the reasons stated above, the court hereby finds and concludes that Mr. Salkhi has failed to prove by a preponderance of the evidence that the Murrays' alleged debt is nondischargeable under § 523(a)(2)(A). The court will enter a separate judgment in Debtors/Defendants Mary Hannah Murray and David Anthony Murray's favor.

**\*\*END OF MEMORANDUM DECISION\*\***

<u>Court Service List</u>